UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

EDWIN PARRA,

                           Plaintiff

                           DECISION AND ORDER

-vs-

                           11-CV-6270 CJS

DR. LESTER WRIGHT, et al.,

                        Defendants

_____

INTRODUCTION

Edwin Parra ("Plaintiff") is an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), and Defendants are medical personnel employed by DOCCS. Plaintiff alleges, pursuant to 42 U.S.C. § 1983 ("§ 1983"), that Defendants violated his Eighth Amendment rights by acting with deliberate indifference to his serious medical needs.[1] Plaintiff also asserts claims under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("§ 504"). Now before the Court is Defendants' motion (Docket No. [#14]) for summary judgment and Plaintiff's motions [#17] [#34] for appointment of counsel. Plaintiff's motions [#17] [#34] for appointment of counsel are denied, and Defendants' motion for summary judgment [#14] is granted in part and denied in part.

---

[1] In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a "person" acting "under the color of state law," and (b) that the defendant caused the plaintiff to be deprived of a federal right. *See, e.g., Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), *overruled on other grounds by Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 663, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

1

BACKGROUND

Unless otherwise indicated, the following are the facts of the case viewed in the light most-favorable to Plaintiff.[2] Plaintiff suffers from degenerative disease in his lumbo-sacral spine, for which he has been receiving pain medications and other treatments while in custody, since approximately 2007. More specifically, MRI testing indicates that Plaintiff has "bulging and disc protrusion," causing some "nerve root impingement," which results in lower-back pain. From the record it appears that at all relevant times, various doctors employed by DOCCS have provided Plaintiff with pain medications and physical therapy, and that other times they have also provided him with an elastic back support, an additional mattress and/or a permit allowing him to sleep on the lower bunk of a two-bunk cell. The pain medications that Plaintiff has received have varied, and include Ultram, Neurontin, Naproxen, Motrin and other analgesics and non-steroidal anti-inflammatory drugs ("NSAIDS").

Plaintiff believes that the most-appropriate treatment for his condition is a combination of Ultram and Neurontin, as well as a back support brace, a double mattress and a lower-bunk permit. Plaintiff has not always been provided with all of those items, and consequently, he alleges that he was denied appropriate medical treatment at three New York State correctional facilities: Wende Correctional Facility

---

[2] As further noted below, the facts are taken from the entire record, including documents submitted in connection with Defendants' summary judgment motion and documents submitted in connection with Plaintiff's motion to preliminary injunctive relief, which was briefed and decided while the summary judgment motion was pending.

("Wende"), Lakeview Correctional Facility ("Lakeview") and Southport Correctional Facility ("Southport").

In that regard, Plaintiff indicates that in "early 2010" he was housed at Wende, and later that year he was transferred to Lakeview. Plaintiff was then transferred to Five Points Correctional Facility ("Five Points") for approximately two months.[3] Then, in or about April 2011, Plaintiff allegedly committed disciplinary infractions at Five Points, for which he was transferred to Southport. Plaintiff's particular complaints about his treatment at Wende, Lakeview and Southport are set out below.

*Wende*

At Wende, Nurse Practitioner Obertean reduced Plaintiff's pain medications and encouraged him to participate in physical therapy to reduce his pain. An entry in Plaintiff's Ambulatory Health Record ("AHR") dated July 12, 2010, indicates that Orbertean spent 48 minutes conducting a physical examination of Plaintiff.[4] Obertean's notes indicate that her findings did not support Plaintiff's subjective complaints of pain. For example, she stated that Plaintiff was not limping when he entered the exam room, but began limping during the exam. Obertean also indicated that Plaintiff appeared to express exaggerated pain when she lightly touched his

---

[3] Between March 2011 and April 2011, Plaintiff was housed at Five Points. At Five Points, Plaintiff believes that he received proper treatment. In particular, he states that Nurse Practitioner Salotti ("Salotti") provided him with Ultram, Neurontin, physical therapy, a back brace and a permit to allow him to sleep on the lower bunk. Plaintiff further states that Salotti told him, "These other medical providers [at other facilities] are just trying to save the state money, they don't care about you." Complaint [#1] at pp. 55-56.

[4] Complaint [#1] at p. 49.

3

back and when she performed a flexion test. On the other hand, Obertean observed that Plaintiff was able to "sit easily in a chair," cross his legs, remove his socks, and perform other movements. Obertean also noted that Plaintiff's Electromyogram ("EMG") test results were normal. Obertean indicated that as a result of her testing, she decided to "slowly taper" Plaintiff off Ultram and treat him with Motrin instead.[5] She also prescribed a new elastic back brace for Plaintiff. However, Obertean denied Plaintiff's requests for an extra mattress and a lower-bunk permit. Plaintiff wrote to Susan Post ("Post"), Deputy Superintendent for Health at Wende, and complained about Obertean. However, on October 6, 2010, Post responded, telling Plaintiff that Obertean's treatment was appropriate, and that Plaintiff should "fully participate" in physical therapy, since that was his "best chance . . . to strengthen [his] core muscles and better control [his] chronic pain."[6]

Lakeview

On October 20, 2010, Nurse Practitioner Larry Wilcox ("Wilcox") wrote to Plaintiff and denied his requests for an additional mattress and for a "lower bunk permit." Wilcox stated that such provisions were not warranted by DOCCS healthcare policies, and that Plaintiff's medications were controlling his pain.[7] Wilcox further indicated that Plaintiff was receiving physical therapy. On November

---

[5]On September 20, 2010, Plaintiff wrote to Deputy Superintendent Susan Post, at Wende, that Obertean was "tapering" him off Ultram. *See*, Complaint [#1] at p. 45. In the same letter, Plaintiff indicated that he was participating in physical therapy. *Id*.

[6]Complaint [#1] at p. 47.

[7]Complaint [#1] at p. 51.

4

15, 2010, Dr. Caisley also wrote to Plaintiff concerning Plaintiff's request for a lower bunk permit. Caisley noted that Plaintiff had received physical therapy, and further stated:

> In the past another facility may have granted you a [lower bunk] permit and given you other things that you now believe you are entitled to. However, my review of our medical record and Health Services Policy 1.49 Lower Bunk Placement indicate that you do not meet the criteria for lower bunk placement. I am enclosing a copy of that policy for your review. . . . It is clear that you do not meet the guidelines as established in that policy.

Complaint [#1] at p. 52. Plaintiff wrote to Eileen DiNisio ("DeNisio"), DOCCS Regional Health Services Administrator, and complained about his treatment at Lakeview. However, on December 21, 2010, DiNisio responded and indicated that Plaintiff's treatment was appropriate. In that regard, DiNisio indicated that Plaintiff was "currently prescribed Neurontin for [his] discomfort."[8]

Southport

On April 14, 2011, Plaintiff arrived at Southport, and nurse D. Weed, R.N., performed an initial medical screening. Weed told Plaintiff that he could not have his elastic brace unless it was approved by the facility doctor, Wesley Canfield, M.D. ("Canfield"). Later that day, Canfield initiated a tapering of Plaintiff's Ultram and Neurontin, which had previously been discontinued at Wende and Lakeview, but which had been re-prescribed at Five Points. More specifically, Canfield reduced Plaintiff's existing prescription of 600 mg of Neurontin and 100 mg of Ultram, to

---

[8]Complaint [#1] at p. 54.

5

300 mg of Neurontin and 50 mg of Ultram. *See*, Amended Complaint [#8] at p. 44 (Indicating that the treatment recommendation was to wean Plaintiff from Neurontin and Ultram over a period of seven days).[9] After approximately one week, medical staff at Southport discontinued Plaintiff's prior pain medication prescription altogether, and replaced it with new medications. Specifically, on April 15, 2011, Nurse Practitioner Ben Oakes ("Oakes") prescribed Naproxen and another pain reliever, the name of which is illegible. *See*, Complaint [#1] at p. 34. Oakes also prescribed the pain medications Flexeril, Voltaren and Feldene, apparently in response to Plaintiff's complaints that the other medications were not effective. Motion to Amend [#6] at p. 2. Oakes also obtained an x-ray of Plaintiff's shoulder, after Plaintiff complained of pain. Amended Complaint [#8] at p. 19. Oakes further requested additional physical therapy for Plaintiff,[10] but in June 2011, DOCCS denied Plaintiff's request for further physical therapy, because he was not participating in any work programs and he did not have a "clear medical necessity" for such treatment. Motion to Amend [#6] at p. 13. Plaintiff indicates that he wrote to Lester Wright, M.D. ("Wright"), DOCCS Deputy Commissioner and Chief Medical Officer, and Wright's successor, Carl Koenigsmann, M.D. ("Koenigsmann"), about "these problems." Amended Complaint [#8] at p. 19. On July 21, 2011, Dr. Canfield wrote to Plaintiff and explained that he discontinued the Ultram and Neurontin after

---

[9]In the body of the pleading, Plaintiff refers to it as his "Second Amended Complaint." The Court will refer to it as his Amended Complaint.

[10]Amended Complaint [#8] at p. 19.

6

reviewing Plaintiff's medical chart. Motion to Amend [#6] at p. 17. Canfield further noted that Oakes had been giving Plaintiff "appropriate medication for [Plaintiff's] conditions." *Id*. Plaintiff also claims that he wrote to Nurse Administrator John VonHagn ("VonHagn"), but "to no avail." Amended Complaint [#8] at p. 17.

Plaintiff further indicates that he wrote to Wendy Lukas, DOCCS Regional Health Service Administrator, but again, "to no apparent avail." Amended Complaint [#8] at p. 17. In that regard, Plaintiff apparently wrote to Lukas in or about May, 2011. On May 20, 2011, Lukas responded in writing, indicating that she had investigated Plaintiff's concerns with Southport's medical staff. Lukas stated, *inter alia*, that although Southport's staff had discontinued Plaintiff's Naprosyn, they were giving him Voltarin and Flexeril instead. *Id*. at p. 53. Lukas further instructed Plaintiff to bring his concerns to the Southport medical staff using the established sick-call procedures. *Id*.

Plaintiff also states that he complained to K. Weaver, R.N. ("Weaver") and "Mr. Clement," R.N. ("Clement"), when they were working as "sick-call" nurses at Southport. Amended Complaint [#8] at p. 18.

With regard to all of the aforementioned claims at the various correctional facilities, Plaintiff states that he "filed several grievances and has exhausted his remedies on one issue." Amended Complaint [#8] at p. 18 (referring to Exhibit D of that document). On this point, Plaintiff admits that he did not file any grievances while at Wende or Lakeview, and that the first inmate grievance he filed concerning these matters was at Southport. Amended Complaint [#8] at ¶ 33.

7

More specifically, on April 21, 2011, Plaintiff filed SPT-51340-11, which complained about the discontinuation of Neurontin and Ultram, and the confiscation of his back brace. On May 4, 2011, the Inmate Grievance Review Committee ("IGRC") denied the grievance. Plaintiff appealed to Southport's Superintendent, and on May 10, 2011, M. Sheahan ("Sheahan"), Assistant Superintendent, denied the appeal. Plaintiff then appealed to the Central Office Review Committee ("CORC"). *See*, Motion to Amend [#6] at p. 19. On July 27, 2011, CORC denied the appeal, noting that Ultram and Neurontin had been discontinued because they were "not medically indicated," and that Plaintiff was instead receiving "Flexeril and Feldene for pain." Amended Complaint [#8] at p. 62.

On June 16, 2011, he filed another grievance at Southport, SPT-51701-11, complaining that the medical staff had discontinued his Ultram and Neurontin, and provided him with other pain medications that were not controlling his pain. Motion to Amend [#6] at p. 9. The IGRC denied the grievance and Plaintiff appealed. On July 8, 2011, Sheahan denied Plaintiff's appeal, stating in pertinent part:

> [G]rievant arrived at Southport on 4/14/11 with an order for Ultram and Neurontin. The physician reviewed his medical record and deemed that these medications were not appropriate treatment. The medication was slowly discontinued and the grievant was continued on the anti-inflammatory, Naprosyn. . . . [O]n 5/9/11 . . . his medication was changed to Flexeril and Voltaren.

Motion to Amend [#6] at p. 10. It appears that on July 12, 2011, Plaintiff appealed Sheahan's decision to the CORC, and that CORC again denied his appeal. *Id*.

Plaintiff filed two additional grievances at Southport, SPT-51785-11 and SPT-

8

51433-11, both of which complained about the alleged lack of medical care. It seems that Plaintiff appealed those grievances to the level of the facility superintendent, but not to CORC. *See, e.g.*, Amended Complaint [#8] at p. 70. On September 27, 2011, Plaintiff filed another grievance, complaining that he had been without his pain medications for "about three weeks," because Flexeril and Feldene "didn't work," and that he had been waiting since August to be seen by a pain management specialist. Supplemental Complaint [#10] at p. 15. On September 28, 2011, Southport's Inmate Grievance Program ("IGP") supervisors wrote to Plaintiff and informed him that they were not going to process that grievance, because his complaints were essentially the same as those that had already been addressed "at levels of the grievance process." Supplemental Complaint [#10] at p. 16. However, the IGP Supervisors indicated that the grievance would be deemed "exhausted," and that Plaintiff could "proceed with legal action if [he] wish[ed]." *Id*.

On May 26, 2011, Plaintiff commenced this action, proceeding *pro se*, and requesting permission to proceed *in forma pauperis*. The Complaint included claims under Section 1983, the ADA and Section 504. The Court reviewed Plaintiff's application, pursuant to 28 U.S.C. § 1915, and directed him to provide additional information. See, Decision and Order [#4]. Subsequently, the Court granted Plaintiff's request to proceed *in forma pauperis*, and directed him to file an amended complaint. *See*, Decision and Order [#7]. On September 1, 2011, Plaintiff filed an Amended Complaint [#8], which again asserts claims under § 1983, the ADA and § 504, and which seeks money damages, as well as declaratory and injunctive relief.

9

On November 8, 2011, the Court completed its review of the Amended Complaint under 28 U.S.C. §§ 1915 and 1915A, and directed service on Defendants. *See*, Order [#9].

On April 9, 2012, almost immediately after most of the Defendants were served and prior to any Rule 16 Conference or any discovery being conducted, Defendants filed the subject motion [#14] for summary judgment.

Defendants' application is odd in several respects. First, the Notice of Motion [#14] clearly indicates that Defendants are requesting summary judgment pursuant to Rule 56, and includes a Rule 56 statement of facts and a declaration from Dr. Canfield, as well as the required *Irby* notice to *pro se* litigants, but the supporting Memorandum of Law [#14-4] includes the Rule 12(b)(6) "motion to dismiss for failure to state a claim" standard, and argues that certain matters are not properly pleaded. *See*, [#14-4] at p. 7. Additionally, when Defendants' counsel filed the motion using the Court's electronic case management system ("CM/ECF"), he apparently designated it as a "motion to dismiss." *See*, Docket entry [#14]. The Court urges that in the future, Defendants' counsel determine the basis for his motion, and draft the supporting papers to accurately and consistently reflect the same. If the notice of motion does not indicate that Defendants are seeking dismissal pursuant to Rule 12(b)(6), the memorandum of law should not contain 12(b)(6) boilerplate. The Court further reminds Defendants' counsel, as discussed further below, that in most cases, it is inappropriate to file a motion for summary judgment prior to Plaintiff having an opportunity to conduct discovery.

In any event, the motion indicates, first, that any claims involving Wende or Lakeview must be dismissed, since Plaintiff never exhausted his administrative remedies as to them. Defendants further maintain that claims against Koenigsmann, Oakes, VonHagn, Wright, Weaver, Clement, Wilcox, Caisley, Levitt and Post should be dismissed for lack of personal involvement. Finally, Defendants contend that the deliberate indifference claims must be dismissed since Defendants provided appropriate medical treatment.[11]

On September 17, 2012, while the summary judgment motion was still pending, Plaintiff filed an application [#19] for preliminary injunctive relief, seeking an order directing medical staff at Southport to provide him with the following: "previously prescribed medications," presumably meaning Ultram and Neurontin; a transcutaneous electrical nerve stimulation ("TENS") unit; "physical therapy"; "double mattress"; and a "back brace." Dr. Canfield responded to the application by indicating that he had discontinued those specific medications and treatments, because they were unnecessary. In that regard, Canfield stated that he reviewed Plaintiff's medical file and determined that Plaintiff's prescribed pain medications, Neurontin and Ultram, were not needed, since a 2009 nerve conduction study was normal, and a 2008 MRI test showed only degenerative disc disease with "minimal"

---

[11] Defendants' memo of law [#14-4] also contains a one-line statement that "Plaintiff's allegations against Defendants in their official capacities should be dismissed," citing *Davis v. New York,* 316 F.3d 93, 102-103 (2d Cir. 2003). However, as noted above, Plaintiff is seeking money damages as well as declaratory and injunctive relief, *see*, Amended Complaint [#8] at ¶ 38, and Defendants have not sufficiently explained the basis or scope of their request on this point.

nerve root impingement. Canfield also stated that in making his decision, he had considered that Plaintiff had a history of drug abuse and smuggling, which made Ultram and Neurontin "counter indicated."

On October 16, 2012, Canfield filed a supplemental declaration [#23] in opposition to Plaintiff's application for preliminary injunctive relief. Canfield stated that when Plaintiff arrived at Southport in April 2012, from Five Points, doctors at Five Points had been prescribing Plaintiff Neurontin, Ultram and a TENS unit, but not a double mattress. Canfield indicated, though, that with the exception of the TENS unit, which Plaintiff received at Southport, he discontinued those treatments, for several reasons, including the following: 1) instead of Neurontin and Ultram, he directed that Plaintiff receive non-steroidal anti-inflammatory drugs ("NSAIDS"), which produce the same results as Ultram and Neurontin but do not have the same serious negative side effects; 2) Neurontin is not appropriate for Plaintiff in any event, since he does not have neurologic pain in his legs; 3) Plaintiff has a "significant history of drug-seeking and drug abuse," and Utram has a chemical structure similiar to opioids, which makes it desirable to inmates who want to abuse the drug; 4) in 2012 the FDA cautioned against prescribing Ultram to addiction-prone patients; 5) Ultram can increase a patient's risk of suicide; 6) Plaintiff may be malingering to obtain the medication, since he is still able to play basketball and softball; and 7) there is no medical literature to support Plaintiff's belief that a "double mattress" is appropriate for back pain.

On October 16, 2012, Plaintiff filed a declaration [#24] in further support of

12

his application for a preliminary injunction, in which he stated that, "Dr. Canfield and staff ha[ve] prescribed many medications and treatments, other than what was previously prescribed . . . even though they have not given me any real relief." *Id*. at ¶ 6. On October 23, 2012, Plaintiff filed another declaration [#25], indicating, *inter alia*, that NSAIDS are not appropriate to treat him, and that Canfield is slandering him by suggesting that he is possibly malingering to obtain drugs. In addition, Plaintiff states that he no longer plays sports.

On September 7, 2012, and September 25, 2013, Plaintiff filed his second and third motions [#17] [#34] for appointment of counsel.

On June 12, 2013, the Honorable Jonathan W. Feldman, United States Magistrate Judge, stayed discovery pending the resolution of "defendants' motion to dismiss." *See*, Order [#32]. There is no indication on the docket that any discovery has taken place in this case to date.

## DISCUSSION

### *Plaintiff's Motions for Appointment of Counsel*

At the outset, Plaintiff's second and third motions for appointment of counsel [#17] [#34] are denied. There is no constitutional right to appointed counsel in civil cases. However, under 28 U.S.C. § 1915(e), the Court may appoint counsel to assist indigent litigants. *See, e.g.*, *Sears, Roebuck & Co. v. Charles W. Sears Real Estate, Inc.*, 865 F.2d 22, 23 (2d Cir. 1988). Assignment of counsel in this matter is clearly within the judge's discretion. *In re Martin-Trigona*, 737 F.2d 1254 (2d Cir. 1984). The factors to be considered in deciding whether or not to assign counsel

13

include the following:

> 1. Whether the indigent's claims seem likely to be of substance;
> 2. Whether the indigent is able to investigate the crucial facts concerning his claim;
> 3. Whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder;
> 4. Whether the legal issues involved are complex; and
> 5. Whether there are any special reasons why appointment of counsel would be more likely to lead to a just determination.

*Hendricks v. Coughlin*, 114 F.3d 390, 392 (2d Cir. 1997); *see also Hodge v. Police Officers*, 802 F.2d 58 (2d Cir. 1986).

Having considered all of the foregoing factors, the Court finds that appointment of counsel is not warranted at this time. For example, as discussed further below, the bulk of Plaintiff's claims are procedurally barred, for failure to exhaust administrative remedies, and the remaining § 1983 claims are of questionable merit inasmuch as they may involve a mere disagreement over treatment.[12] Moreover, the claims are not overly complex, and Plaintiff has so far done a satisfactory job of presenting them to the Court without the assistance of an attorney.

### *Defendants' Motion for Summary Judgment*

Summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the

---

[12] The merits *vel non* of the ADA and Section 504 claims are unclear, since the parties did not brief them.

14

non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993). Moreover, since Plaintiff is proceeding *pro se*, the Court is required to construe his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994).

Although Plaintiff has not raised the issue, the Court is mindful that no discovery has yet taken place in this action, since "[o]nly in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." *Young v. Benjamin Development Inc.*, 395 Fed.Appx. 721, 722–723, 2010 WL 3860498 at *1 (2d Cir. Oct.5, 2010) (citation omitted). For this reason, the Court will deny, without prejudice to renew once discovery has been completed, the bulk of Defendants' motion. However, the Court will address Defendants' motion insofar as it is directed at Plaintiff's alleged failure to exhaust his administrative remedies. In that regard, the facts regarding Plaintiff's efforts at exhaustion are not disputed, and it does not appear that any amount of discovery would change the outcome of that portion of the application.

*Exhaustion of Administrative Remedies*

Defendants admit that while at Southport, Plaintiff exhausted his administrative remedies concerning his claim that he was denied his back brace and pain medications. *See*, Def. Memo of Law [#14-4] at p. 2. However, Defendants

15

contend that all claims "relating to events occurring at other facilities have not been grieved to exhaustion, and, as such, should be dismissed." *Id*. at p. 7. The Court agrees that the claims involving Wende and Lakeview are unexhausted. On this point, the legal principles are clear:

> The Prison Litigation Reform Act of 1995 ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The PLRA exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong. Prisoners must utilize the state's grievance procedures, regardless of whether the relief sought is offered through those procedures.
>
> * * *
>
> The exhaustion inquiry thus requires that we look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures.
>
> * * *
>
> The IGP has a regular three-tiered process for adjudicating inmate complaints: (1) the prisoner files a grievance with the Inmate Grievance Resolution Committee ("IGRC"), (2) the prisoner may appeal an adverse decision by the IGRC to the superintendent of the facility, and (3) the prisoner then may appeal an adverse decision by the superintendent to the Central Officer Review Committee ("CORC"). N.Y. Comp.Codes R. & Regs., tit. 7, § 701.7.

*Espinal v. Goord*, 558 F.3d 119, 123-125 (2d Cir. 2009) (citations and internal quotation marks omitted). As the exhaustion statute indicates, it applies to § 1983 claims and claims "under any other Federal law," including the ADA and § 504. *See, e.g., Arce v. O'Connell*, 427 F.Supp.2d 435, 440 (S.D.N.Y. 2006) ("It is undisputed

16

that claims under the ADA must be exhausted via the grievance procedure established under the PLRA."); *see also, Alster v. Goord*, 745 F.Supp.2d 317, 332 (S.D.N.Y. 2010) (agreeing that inmates' ADA claims must be exhausted)

In this case, Plaintiff did not attempt to utilize New York's Inmate Grievance Process while he was at Wende or Lakeview. Plaintiff nevertheless contends that he exhausted his administrative remedies. In that regard, he states:

> Plaintiff has 'exhausted' all administrative remedies readily available to him, by the State of New York. He has filed several 'grievances' in the only prison that permits such remedy (Southport Correctional Facility); and has addressed his medical issues and complaints to those whom hold supervisory positions in the other prisons in the Department of Corrections and Community Supervision. In all its aspects, Plaintiff, as a *pro se* litigant, has properly 'exhausted' all administrative remedies to the best of his knowledge and understanding. Plaintiff has also received several final decisions from the Department of Corrections and Community Supervision's 'Central Office Review Committee' (Grievance Office), in regards to the grievances filed at Southport Correctional Facility, which he hopes to adduce at trial.

Pl. Response to Motion to Dismiss [#16] at p. 3. However, Plaintiff's assertion that Southport is the only facility with an Inmate Grievance Program is indisputably incorrect. Nor is it plausible for Plaintiff to make such an assertion, considering that his most-recent term of incarceration began in 1998, more than ten years prior to the events at issue here, and that he has been housed at numerous different facilities

during that time, all of which, by law,[13] had Inmate Grievance Programs.[14] Plaintiff's vague statement that he acted "to the best of his knowledge" does not fall within any of the recognized exceptions to the exhaustion requirement.[15] Furthermore, Plaintiff's letters to various personnel are not grievances within the meaning of § 1997e(a). In that regard, under New York law, an inmate grievance is

> a complaint, filed with an IGP clerk, about the substance or application of any written or unwritten policy, regulation, procedure or rule of the Department of Correctional Services or any of its program units, or the lack of a policy, regulation, procedure or rule. *A letter addressed to facility or central office staff is not a grievance.*

7 NYCRR § 701.2(a) (emphasis added). Plaintiff's letters, therefore, do not amount to grievances.

In summary, Plaintiff's claims concerning Wende and Lakeview must be

---

[13] *See*, New York Corrections Law § 139.

[14] According to the DOCCS website, this is Plaintiff's third sentence of imprisonment, having previously been incarcerated in 1991 and 1993.

[15] *See, Chisholm v. New York City Dept. of Correction*, No. 08 Civ. 8795(SAS) 2009 WL 2033085 at *2 (S.D.N.Y. Jul. 13, 2009) ("While the Second Circuit has recognized that the PLRA's exhaustion requirement is mandatory, it has also recognized three exceptions to the exhaustion requirement: 'when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as reasonable misunderstanding of the grievance procedure, justify the prisoner's failure to comply with the exhaustion requirement.'") (*citing Ruggiero v. County of Orange*, 467 F.3d 170, 175 (2d Cir. 2006)); *but see, Cuello v. Lindsay*, No. 09–CV–4525 (KAM)(MDG), 2011 WL 1134711 at *9 (E.D.N.Y. Mar. 25, 2011) (Inmate's ignorance of the exhaustion requirement is not a "special circumstance" that will excuse exhaustion); *Smith v. City of New York*, No. 12 Civ. 3303(CM), 2013 WL 5434144 at *21 (S.D.N.Y. Sep. 26, 2013) (Being unaware of exhaustion requirement "is no justification for [plaintiff's] failure to exhaust his administrative remedies.").

dismissed for failure to exhaust administrative remedies. The dismissal is with prejudice, since those administrative remedies are no longer available to him. *See, Bridgeforth v. Bartlett*, 686 F.Supp.2d 238, 240 (W.D.N.Y. 2010) ("Since the time limits for plaintiff to file an administrative appeal have long since passed, administrative remedies are no longer available to him, as a result of his own inaction. This case, then, is precisely the kind of case that the PLRA was intended to foreclose."); *see also*, 7 NYCRR § 701.5(a)(1) (New York's IGP regulations require, in pertinent part, that grievances be filed "within 21 calendar days of an alleged occurrence.").

## CONCLUSION

Plaintiff's motions [#17] [#34] for appointment of counsel are denied. Defendants' motion for summary judgment [#14] is granted as to the claims involving Wende and Lakeview, but is otherwise denied without prejudice to the parties bringing further summary judgment motions once discovery is completed. Defendants' counsel is directed to immediately contact Magistrate Judge Feldman's chambers to Request a Scheduling Order.

So Ordered.

Dated:   Rochester, New York
         December 18, 2013

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge